1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

12 JOSEPH A. RATKOVIC,                ) CASE NO. CV 06-08255 MMM (JWJx)
                                      )
13         Plaintiff,                 )
                                      )
14    vs.                             ) FINDINGS OF FACT AND
                                      ) CONCLUSIONS OF LAW
15 NORTHROP GRUMMAN                   )
   CORPORATION EMPLOYEE               )
16 WELFARE BENEFIT PLAN               )
                                      )
17         Defendants.                )
                                      )
18 _____)

19

20        Plaintiff Joseph A. Ratkovic filed this action on December 28, 2006, against Northrop

21 Grummon Corporation Employee Welfare Plan ("NGC"), UNUM Life Insurance Company of

22 America ("UNUM"), and Metropolitan Life Insurance Company ("Met Life").  On May 9, 2007,

23 the parties stipulated to dismiss UNUM because it acted only as the claims administrator for NGC.

24 On December 12, 2007, the parties stipulated to dismiss Met Life with prejudice under Rule

25 41(a)(1).  Ratkovic seeks relief for the denial of long-term disability coverage to which he claims

26 he is entitled under a group long-term disability benefit plan underwritten by NGC ("the Plan").

27 Specifically, Ratkovic seeks declaratory relief, plan benefits, pre-judgment interest, restitution,

28 attorneys' fees and costs, and other appropriate relief.  After consideration of the parties' trial

briefs, rebuttal briefs, and the administrative record, the court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A.    The Plan

1.    The Plan is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), because it is an employee benefit plan funded by Ratkovic's employer.[1]

2.    NGC is the plan administrator and a plan fiduciary for ERISA purposes.  NGC has delegated the role of Claims Administrator to UNUM.[2]

3.    The Plan is self-insured, meaning that NGC pays out any benefits awarded.  Thus, UNUM acts only as the claims administrator and has no financial interest in the outcome of a given claims decision.

4.    Under the Plan, Ratkovic was eligible to receive monthly long term disability ("LTD") benefits "if [he] bec[a]me Disabled as defined by the Plan while covered under the plan. . . . [and remained] under the care of a Duly Qualified Physician throughout the Elimination Period of 180 consecutive days."[3]

5.    The Plan states that "benefits will begin to accrue on the date following the day [the participant] complete[s] the Elimination Period."[4]

6.    No benefits are payable during the Elimination Period.  "The Elimination Period begins on the day [the participant] become[s] Disabled and continues for 180 consecutive days" during which the claimant must be under the "continuous care of a Duly Qualified

---

[1]Administrative Record ("AR") at 642.

[2]AR at 641.

[3]AR at 630.

[4]AR at 630.

2

1    Physician."[5]

2    7.    Monthly benefits under the plan are equal to 60% of a claimant's pre-disability monthly

3         income with a maximum monthly payment of $10,000 and a minimum of $50.[6]

4    8.    For purposes of coverage under the Plan, "disabled" means that:

5              "due to sickness, pregnancy or accidental injury, you are receiving

6              Appropriate Care and Treatment from a qualified physician on a

7              continuing basis; and [1] Your disability prevents you from

8              performing any and every duty of your regular occupation during the

9              Elimination Period and the next 24 month period; or [2] After the

10             first 24 months in which you have received benefits, you are unable

11             to perform any and every duty of any gainful occupation for which

12             you are reasonably qualified by training, education or experience."[7]

13   9.    Relevant here, the Plan also provides that monthly benefits will be paid until, *inter alia*,

14        "[t]he date you are no longer disabled as defined by the Plan; [or] the date you fail to

15        provide proof of disability as required by the Plan Administrator . . . ."[8]

16   10.   Pursuant to the benefits summary provided by NGC to its employees, the Plan

17        Administrator

18             "has the discretion to interpret the Plan and decide any and all

19             matters arising from the Plan.  The Plan Administrator has delegated

20             [UNUM][9] to have sole power and duty to review and determine

21             claims filed under the Plan and the power and duty to process all

22   _____

23        [5]AR at 631.

24        [6]AR at 629.

25        [7]AR at 632.

26        [8]AR at 632.

27             [9]The plan itself identifies Met Life as the Claims Administrator; on July 1, 2003, however,

28   that role was delegated to UNUM.  (Defendant's Trial Brief ("Def.'s Brief") at 5 n. 5.)

1    claims and appeals and to provide other administrative services."[10]

2    11.   If disabled, Ratkovic is eligible under the Plan to receive benefits until age 65.[11]

3    12.   The Plan provides that any monthly benefits paid for any period of disability must be

4    reduced by any "'Other Income Benefit' which is paid or payable for the same period of

5    disability." These benefits include, *inter alia*, "[t]he amount provided under any Worker's

6    Compensation, Employer Liability or similar law," and "[t]he amount of both Primary and

7    Dependent's eligible benefits under the Social Security Act and Railroad Retirement Act."[12]

8    13.   Reductions for "other income benefits" are limited so that the monthly benefit under the

9    Plan will not be less than $50.00 per month. The only exceptions to this are if there has

10   been an overpayment of benefits or the claimant is receiving income from employment.[13]

11   14.   The Plan requires claimants to file for Social Security Disability ("SSDI") and provides

12   that "Social Security benefits will be estimated and used to reduce your initial benefit even

13   if you fail to apply."[14]

14   15.   The Plan also requires claimants to

15          "promptly notify the Plan if any award or settlement derived from

16          any 'other income' source is, or will become, payable or increased

17          retroactively. If benefits are being paid to you in excess of those

18          which should have been paid, the Plan will have the right to a refund

19          of the overpayment from you. The amount of the refund is the

20          difference between: [1] the amount of [LTD] benefits paid by the

21          Plan; and [2] the amount of [LTD] benefits that should have been

22

23   _____

24   [10]AR at 641.

25   [11]See AR at 629.

26   [12]AR at 634.

27   [13]AR at 634.

28   [14]AR at 635.

4

1   paid by the Plan."[15]

2   **B.      Background, Diagnosis, and Initial Handling of Ratkovic's Claim**

3   16.   Ratkovic began working for Northrop Grumman in 1984.  On his initial claim form,

4         Ratkovic asserted that on June 5, 2002, while traveling to give a presentation for the

5         company, he tripped and fell in an underground bunker in Taiwan.  The fall injured his

6         knee, and Ratkovic underwent surgery on September 10, 2002 to repair it.  He claimed that

7         since that time, he had had difficulty walking without pain.[16]

8   17.   Ratkovic stopped working on September 9, 2002, but attempted to return to work between

9         December 9, 2002 and January 16, 2003.[17]

10  18.   On his claim form, Ratkovic stated that he was a "Research Scientist" at the time he

11        became disabled.[18]  NGC described his position as "Engineering & Sciences - Multi-

12        Discipline," referencing the generic description provided by the Department of Labor, i.e.,

13        "This benchmark is intended to be used by companies that have generic classifications

14        engaged in research and/or product development encompassing primarily one or more of

15        the following engineering disciplines: electronics, electrical, mechanical, and/or

16        chemical."[19]

17  19.   In January 2004, Ratkovic submitted a claim for LTD benefits.[20]

18  20.   Both Ratkovic and his supervisor submitted descriptions of Ratkovic's job duties that were

19        substantially similar.  Ratkovic stated that in a normal 40 hour week he performed the

20        following tasks:

21

22   [15]AR at 635.

23   [16]AR at 15.

24   [17]AR at 61.

25   [18]AR at 15.

26   [19]AR at 36-38.

27   [20]AR at 15.

28

     i.      24 hours: "perform advanced projects studies/work

     ii.     8 hours: "attend project/planning meetings"

     iii.    8 hours: "travel to vendors/customers"[21]

Chief Scientist J.R. Huddle stated that Ratkovic was a "Sr. Engineer Multidiscipline" who in a typical 40 hour week performed the following tasks:

     iv.    20 hours: Develop Concepts - "this is a creative task which requires the development of Navigation System concepts"

     v.     12 hours: Write Proposals

     vi.    8 hours: Presentations - "Prepare and deliver presentations to customers"

Huddle noted that Ratkovic's "job tasks [could] be performed primarily at a desk," but that "presentations that must be made require traveling to customer premises and standing to deliver the presentation."[22]

21.    Ratkovic's treating physician, Dr. Lombardo, reviewed Ratkovic's job description and concluded that he " would not be capable of ambulating, would not be capable of walking, would not be capable of standing up to 3 hours, would not be capable of climbing . . ."[23]

22.    After obtaining medical records from Dr. Lombardo and a job description from Northrop Grumman, UNUM had the records reviewed by a registered nurse and board-certified orthopedic surgeon.  The nurse and surgeon agreed that the records supported the conclusion that Ratkovic could not perform his occupation and was disabled.[24]

23.    On May 3, 2004, UNUM sent a letter approving Ratkovic's request for LTD benefits. UNUM determined that Ratkovic's Elimination Period had started on January 17, 2003. Using this date, it awarded Ratkovic benefits for the period from July 16, 2003 (180 days

---

[21]AR at 15.

[22]AR at 77.

[23]AR at 180.

[24]AR at 238-39, 241.

1    after January 17, 2003) through April 30, 2004.[25]

2    24.    In the letter approving his benefits request, UNUM advised Ratkovic that under the terms

3           of the Plan, he was required to apply for SSDI benefits and provide information regarding

4           his Worker's Compensation ("WC") claim.  UNUM also reminded Ratkovic that if the

5           information was not provided, it could estimate and deduct SSDI and WC benefits from

6           his LTD benefits.[26]

7    25.    On July 6, 2004, Ratkovic provided a portion of the information requested concerning his

8           WC benefits and informed UNUM that he was in the process of applying for SSDI

9           benefits.[27]

10   26.    In November 2004, Ratkovic's attorney told UNUM that he had been approved for SSDI

11          and that she would send the award letter once she received it.[28]  Despite repeated requests

12          by UNUM and repeated promises by Ratkovic's attorney, neither Ratkovic nor his attorney

13          provided UNUM with a copy of the award letter.[29]

14   27.    During her November 2004 conversation with UNUM, Ratkovic's attorney stated that

15          Ratkovic was going to have knee surgery, but that he needed gastric bypass surgery to

16          address his obesity before he could have the knee surgery.  She advised that Ratkovic was

17          scheduled to have gastric bypass surgery within a week and that he would have knee

18          surgery nine months later.[30]

19   _____

20        [25]AR at 279.  Ratkovic initially argued that the Elimination Period should have begun on
     September 9, 2002.  (AR at 283.)  Ratkovic has abandoned this argument by asserting in his
21   complaint that he became disabled under the policy on January 17, 2003.  (Complaint, ¶¶ 13-14.)

22        [26]AR at 279-81.

23        [27]AR at 346.

24        [28]AR at 392.  Ratkovic's attorney also told UNUM that Ratkovic did not wish to be
25   contacted further and that all future correspondence should be directed to her.

26        [29]See e.g., AR at 392, 397-98, 400, 402, 404.  There is no indication in the record that
27   Ratkovic ever gave UNUM a copy of the SSDI award letter.

28        [30]AR at 392.

7

28.   Having not received a copy of the SSDI award letter, UNUM advised Ratkovic on February 16, 2005, that it intended to apply an estimated SSDI offset as permitted under the Plan.  Based on the estimated offset, UNUM determined that it had overpaid Ratkovic $34,164.00 for the period from July 16, 2003 to December 1, 2004.  UNUM stated that if Ratkovic failed to repay this amount, it would apply future benefit payments to recoup the overpayment.[31]

29.   After leaving an (unanswered) message with Ratkovic's attorney on March 21, 2005, UNUM began to offset the overpayment by deducting it from Ratkovic's monthly benefit payments – reducing the monthly benefit to $0.00.[32]

**C.    UNUM's Decision to Terminate Ratkovic's LTD Benefits**

30.   On May 16, 2005, UNUM sent Ratkovic a letter advising that it required updated medical records and a certification of his continued disability.  UNUM attached a "Claimant's Supplemental Statement" form and forms for Ratkovic's treating physician to complete. UNUM requested a response to this letter by June 16, 2005.[33]

31.   Having received no response, UNUM contacted Ratkovic's attorney on June 22, 2005. At her request, it sent her a second set of the forms together with a second letter requesting updated information.[34]

32.   On July 26, 2005, UNUM had still not received the requested information from Ratkovic. UNUM wrote a third letter to Ratkovic's attorney, once again requesting updated information.  UNUM stated that it would close Ratkovic's claim if no further information was received by August 27, 2005.[35]

---

[31]AR at 407, 410-11.

[32]AR at 412, 414.

[33]AR at 417-18.

[34]AR at 421, 423, 431-40.

[35]AR at 448-60.

33. By August 31, 2005, UNUM had received no response from Ratkovic; it called his attorney again and left a message requesting the updated information.[36]

34. On September 1, 2005, UNUM sent Ratkovic a letter, which stated that it was closing his claim "with no further benefits due" because Ratkovic had failed to provide "proof of disability as required by the Plan Administrator." The letter informed Ratkovic that he owed $25,055.70 in outstanding overpayments on his claim, and requested that he forward a check in that amount to NGC.[37]

**D.      Ratkovic's Appeal of the Decision to Terminate His LTD Benefits**

35. On January 18, 2006, Ratkovic's attorney wrote UNUM to appeal the decision to close his claim. She attached a copy of Ratkovic's SSDI award, WC information, and a November 1, 2005 report from Dr. Lombardo. The letter stated that the remainder of the claim forms would be provided under separate cover.[38]

36. Dr. Lombardo's report stated that Ratkovic had lost 70 pounds since his gastric bypass surgery, and advised that his work restrictions were as follows: (1) "he would predominantly have to have a sitting job with an opportunity to move about for comfort reasons;" (2) "[t]he sitting would be 50 minutes out of every hour;" and (3) "[h]is lifting capacity should be 5 to 10 pounds."[39]

37. On January 25, 2006, UNUM acknowledged receipt of Ratkovic's appeal. On January 27, 2006 it granted Ratkovic's request for a 30-day extension of time to submit the remaining claim forms and further information, and on January 30, 2006, it sent his attorney a copy

---

[36]AR at 463.

[37]AR at 466-70.

[38]AR at 492. The letter calculated the benefits that would have accrued had payments not been stopped and requested that UNUM forward a check for the difference between the benefits purportedly owed and the overpayment.

[39]AR at 505-06.

9

1    of Ratkovic's claims file and UNUM's claims manual.[40]

2  38.  On February 24, 2006, UNUM still had not received the remaining claim forms or any

3    additional evidence.  It wrote Ratkovic, advising that his file was being sent for a medical

4    review.[41]

5  39.  On February 27, 2006, Ratkovic's attorney faxed a supplemental statement from Ratkovic

6    along with a one page WC form completed by Dr. Lombardo.  These documents were

7    included in the record for review.[42]  Ratkovic's supplemental statement indicated that had

8    an ongoing disability because he had "difficulty in walking, climbing steps, [and] carrying

9    any heavy objects due to [his] knee injury[,] which [made] visiting clients/partners very

10    difficult."  Ratkovic stated that his "work also require[d] extensive walking around the

11    facility which [he could not] do."  Finally, Ratkovic reported that the "gastric bypass

12    surgery ha[d] left [him] with an occasional bout of 'dumping syndrome' which cause[d]

13    [him] to throw up 12 hours at a time."[43]  Dr. Lombardo's statement merely restated his

14    diagnosis of "medial compartment osteoarthritis."[44]

15  40.  UNUM sent Ratkovic's medical records to another registered nurse, another orthopedic

16    surgeon, and a vocational consultant for review.  After reviewing the records, nurse

17    Florence Kelly found that the "restrictions provided by Dr. Lombardo 11/05 seem

18    reasonable and consistent with opinion as of 3/30/04.  Further clarification will be deferred

19    to the physician reviewer."[45]  Dr. Joel B. Hoag reviewed the records and concluded that

20    Ratkovic was experiencing "left knee pain unresolved and underlying condition

21

22    _____

    [40]AR at 509, 522, 524, 528.

23
    [41]AR at 534-35.
24

25    [42]AR at 544-50.

26    [43]AR at 546.

27    [44]AR at 549.

28    [45]AR at 593.

progressively worsening." He opined that Ratkovic would be subject to the following restrictions and limitations: "sedentary capacity with lifting/carrying continuously of 10 pounds, occasional lift/carry 20 pounds, bend, kneel, climb stairs, reach above shoulder and push/pull 25 pounds, but never crawl use upper extremities for bimanual dexterity or feet for repetitive activities."[46] The vocational analyst, Richard Byard, compared the restrictions and limitations provided by Dr. Hoag with Ratkovic's occupational information. He determined that:

> "The material and substantial duties of the Aerospace Engineer occupation call for the design, development, testing and evaluation of engineering theories and applications. The work may involve written research proposals, the completion of statistical modeling tasks, evaluating prototypes, writing research summaries, and presenting results.
>
> As generally performed, this occupation typically calls for the occasional lifting/exertion of force of up to 20 lbs. The work is primarily performed in a seated posture with the occasional opportunity for standing and/or walking throughout the work day.
>
> Based on the available information, it is reasonable to conclude that the physical demands of the claimant's occupation would not exceed his level of work capacity. . . . None of the specifically listed [restrictions and limitations] would serve to preclude the claimant from performing the material and substantial duties of his occupation as it is generally performed.
>
> The same conclusion would be reached with respect to the claimant's ability to perform the material and substantial duties of his

---

[46]AR at 609.

1       own job as performed at this policyholder."[47]

2       **E.    UNUM's Decision to Deny Ratkovic's Appeal**

3   41. Based on this medical review, UNUM upheld its decision to terminate Ratkovic's benefits

4       as of August 2005.  On May 5, 2006 UNUM wrote Ratkovic a letter explaining its reasons

5       for denying his appeal.[48]  Although it had closed Ratkovic's claim originally because he

6       failed to respond to its requests for further proof of disability, UNUM based its denial of

7       the appeal on a "comprehensive review of [Ratkovic's] claim file."[49]  The denial letter

8       recounted Ratkovic's medical and treatment history.  It noted Dr. Lombardo's assertion

9       that Ratkovic would "primarily have to have a sitting job with an opportunity to move for

10      comfort reasons," and the further information provided indicating that Ratkovic could

11      occasionally bend, kneel, climb stairs, etc.[50]  The letter recited Dr. Hoag's conclusions,

12      including that Ratkovic had "sedentary capacity."[51]  It also described the vocational

13      review, which found that Ratkovic's restrictions and limitations did not prevent him from

14      performing his occupation as it is generally performed or as it was specifically performed

15      at his employer.[52]  Based on a review of this information, the letter, which was addressed

16      to Ratkovic's attorney, concluded that

17              "the restrictions and limitations supported by our doctoral review,

18              which are in agreement with the restrictions and limitations submitted

19              by your office on February 27, 2006 do not preclude [Ratkovic] from

20              performing his occupation.  As such, your client does not meet his

21      _____

22      [47]AR at 611-12.

23      [48]AR at 623.

24      [49]AR at 623.

25      [50]AR at 624.

26      [51]AR at 624.

27      [52]AR at 625.

28

                                12

policy's definition of disability.  Therefore we are unable to approve benefits beyond August 31, 2005 and must uphold our previous denial decision."[53]

The letter recalculated the overpayment of benefits to Ratkovic, and asserted that he was required to reimburse UNUM $26,994.77.[54]

42.   On December 28, 2006, Ratkovic filed this action seeking review of UNUM's decision. Ratkovic does not appear to contest UNUM's calculation of the overpayment or its initial decision to terminate his claim for failure to provide information.  Instead, Ratkovic challenges UNUM's assessment of his medical condition and its conclusion that he was not disabled.

## II.  CONCLUSIONS OF LAW

43.   The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001 et seq.

### A.   Standard of Review

44.   The court reviews challenges to an ERISA plan's denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989).  "Where the plan vests the administrator with discretionary authority to determine eligibility for benefits, however, a district court may review the administrator's determinations only for an abuse of discretion." *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1471 n. 2 (9th Cir. 1994); see also *Nord v. Black & Decker Disability Plan*, 356 F.3d 1008, 1010 (9th Cir. 2004) ("where, as here, a plan administrator has 'discretionary authority to determine eligibility for benefits,' we review the benefits decision for abuse of discretion"), cert. denied, 125 S.Ct. 62 (2004).

---

[53]AR at 625.

[54]AR at 625.

13

1   The plan specifically conferred discretionary authority on NGC as the plan administrator;

2   NGC delegated that discretionary authority to UNUM.[55]  Absent a conflict of interest or

3   other overriding factor, therefore, abuse of discretion is the appropriate standard of review.

4   45.   Where an administrator is operating under a conflict of interest, "that conflict must be

5   weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"  *Firestone*,

6   489 U.S. at 115; see also *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 384 n. 15

7   (2002) ("review for abuse of discretion [should] home in on any conflict of interest on the

8   plan fiduciary's part, if a conflict was plausibly raised"); see also *Jordan v. Northrop*

9   *Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir. 2003) (quoting

10  *Firestone*).

11  46.   Prior to 2006, the Ninth Circuit held that where a plan participant showed "material,

12  probative evidence [of a conflict of interest], beyond the mere fact of the apparent

13  conflict," the burden shifted to the plan to show that no conflict affected its decision.  See

14  *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1323 (9th Cir. 1995).  If the plan could

15  not "carry that burden, [the court would] review the decision *de novo*, without deference

16  to the administrator's tainted exercise of discretion."  *Id*.  In 2006, an *en banc* panel of the

17  Ninth Circuit overruled *Atwood* after concluding that it was inconsistent with *Firestone*.

18  See *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 967 (9th Cir. 2006) ("[W]e

19  overrule *Atwood* in its entirety and, instead, adopt an approach that, we believe, more

20  accurately reflects the Supreme Court's instructions in *Firestone*.")  The *Abatie* court held

21  that *Firestone* "require[s] abuse of discretion review whenever an ERISA plan grants

22  discretion to the plan administrator, but a review informed by the nature, extent, and effect

23  on the decision-making process of any conflict of interest that may appear in the record."

24  *Id*.   Thus, no matter the degree to which a conflict of interest affects the plan

25

26  [55]See AR at 641 ("The Plan Administrator has the discretion to interpret the Plan and
27  decide any and all matters arising from the Plan.  The Plan Administrator has designated [UNUM]
    to have sole power and duty to review and determine claims filed under the Plan and the power
28  and duty to process all claims and appeals and provide other administrative services").

administrator's decision, the standard of review remains abuse of discretion.  The existence

of a conflict, and its extent, are merely factors to be considered in determining whether the

administrator abused its discretion in deciding the claim.  See *id*. ("A district court, when

faced with all the facts and circumstances, must decide in each case how much or how little

to credit the plan administrator's reason for denying insurance coverage.  An egregious

conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion

more readily) than a minor, technical conflict might"); see also  *Metro. Life Ins. Co. v.*

*Glenn*, __ U.S. __, 128 S.Ct. 2343, 2351 (2008) (stating that an administrator's conflict

of interest may be an important factor if "circumstances suggest a higher likelihood that

it affected the benefits decision, including, but not limited to, cases where an insurance

company administrator has a history of biased claims administration"); *Abatie*, 458 f.3d

at 968 (importance of a conflict may be low if there is no "evidence of malice, of self-

dealing, or of a parsimonious claims-granting history").

47.   Accordingly, the court reviews UNUM's (and by extension, NGC's) determination to deny

Ratkovic's LTD benefits for abuse of discretion.[56]

**B.     Standard Governing Abuse of Discretion Review**

48.   In assessing whether an ERISA fiduciary has abused its discretion, courts must consider

factors such as whether the benefits decision conflicts with the plain language of the plan

(see *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 553 (9th Cir. 1995), cert. denied,

516 U.S. 908 (1995)), whether the fiduciary failed to provide an explanation of its decision

(*Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*,

349 F.3d 1098, 1108 (9th Cir.  2003)), and whether the fiduciary made clearly erroneous

findings of fact in making the benefits determination (see *id.*; *Taft*,, 9 F.3d at 1472).  See

also *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir.

2005) ("An ERISA administrator abuses its discretion only if it (1) renders a decision

without explanation, (2) construes provisions of the plan in a way that conflicts with the

_____

[56]The parties agree that an abuse of discretion standard applies.

plain language of the plan, or (3) relies on clearly erroneous findings of fact"); *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 944 (9th Cir. 1999) ("[I]t is an abuse of discretion for ERISA plan administrators to render decisions without any explanation, or to construe provisions of the plan in a way that conflicts with the plain language of the plan"); *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1123 (9th Cir. 1998) ("Although . . . an ERISA administrator is entitled to substantial deference, it still must have some reasonable basis for its decision denying benefits"); *Atwood*, 45 F.3d at 1323-24 ("It is an abuse of discretion for an ERISA plan administrator to make a decision without any explanation, or in a way that conflicts with the plain language of the plan, or that is based on clearly erroneous findings of fact"); *Siebert v. Standard Ins. Co.*, 220 F.Supp.2d 1128, 1141 (C.D. Cal. 2002) ("Generally, ERISA plan administrators abuse their discretion if they render decisions without any explanation or in a way that conflicts with the plain language of the Plan, or that are based on clearly erroneous findings of fact").

49.   Under *Abatie*, the court must also assess whether a conflict of interest is apparent on the record and what effect that conflict will have on the deference accorded to the administrator's decision.   See *Abatie*, 458 F.3d at 969 ("A straightforward abuse of discretion analysis allows a court to tailor its review to all the circumstances before it"); see also *Rush Prudential HMO*, 536 U.S. at 384 n. 15 ("An issue implicated by this case but requiring no resolution is the degree to which a plan provision for unfettered discretion in benefit determinations guarantees truly deferential review. . . . It is a fair question just how deferential the review can be when the judicial eye is peeled for conflict of interest"). Ultimately, abuse of discretion review "is inherently flexible, [and] enables reviewing courts to simply adjust for the cirucmstances." *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1161 (8th Cir. 1998) (quoted with approval in *Abatie*, 458 F.3d at 968); see also *Abatie*, 458 F.3d at 969 (noting that abuse of discretion review, with conflict weighed as a factor, is "indefinite," and that it involves "something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records").

16

1      **C.      UNUM's Decision to Deny Ratkovic's LTD Benefits Was an Abuse of**
2              **Discretion**

3   50.   UNUM (and derivatively NGG) abused its discretion in terminating Ratkovic's LTD
4         benefits because UNUM failed to consider undisputed evidence in the record that travel
5         was an integral part of Ratkovic's job.

6   51.   As noted, UNUM's initial decision to terminate Ratkovic's claim was based on Ratkovic's
7         failure to provide documentation that had been requested.  Ratkovic did not challenge that
8         conclusion on appeal; rather, he submitted new information and asserted that he remained
9         disabled.  UNUM reviewed the substance of the information Ratkovic provided in support
10        of the appeal, and determined that he was no longer disabled under the terms of the Plan.
11        As NGC notes, UNUM offered two rationales for its decision: (1) that "[p]laintiff's
12        treating physician, as well as UNUM's consulting doctors, all came to the same
13        conclusion; that Plaintiff could perform a sedentary level occupation";[57] and (2)
14        "U[NUM]'s vocational analyst concluded that Plaintiff's occupation, as well as his own job
15        with [NGC], afforded him the ability to perform within his restrictions and limitations."[58]

16  52.   The parties do not dispute the accuracy of the opinions offered by UNUM's doctors.
17        Indeed, after reviewing Dr. Hoag's findings, Ratkovic concluded that Hoag "agreed with
18        the restrictions and limitations [that his] treating physician [had imposed,] and further
19        [concluded] that [his] condition was worsening."[59]  The dispute on appeal, therefore, is not
20        whether UNUM's medical assessment was correct or consistent with that of Ratkovic's
21        treating physician.  Rather, Ratkovic challenges UNUM's decision on three grounds:
22        (1) He asserts that UNUM misclassified his occupation as "sedentary" because it failed

23

24

25  _____

26  [57]Defendant's Responsive Trial Brief ("Def.'s Reply") at 2.

27  [58]*Id.*

28  [59]Pl.'s Reply at 6.

17

properly to investigate and review the record.[60]  (2) He contends that UNUM failed to consider the fact that Ratkovic had been approved for benefits by SSDI.[61] (3) He argues that UNUM and its vocational analyst misapplied the terms of the Plan in concluding that his restrictions and limitations did not preclude him "from performing the material and substantial duties of his occupation" as it is generally performed and as it is performed at his employer.[62]  Ratkovic notes, in this regard, that the Plan defines disability as being unable to perform "any and every duty of your regular occupation."[63]

### 1.   UNUM Failed To Consider All of the Evidence in the Record Regarding Ratkovic's Job Description

53.   UNUM approved Ratkovic's initial application for LTD benefits, finding that he was disabled under the terms of the Plan.[64]  Although it did not explain its reasoning in the letter approving his benefits claim, to have found that Ratkovic disabled, UNUM must have determined that he could not perform "any and every duty of his regular occupation."

54.   At the time of the inital approval, there were two job descriptions in the record.  Ratkovic stated that in a 40 hour week, he spent 24 hours "perform[ing] advanced project studies/work," 8 hours "attend[ing] project/planning meetings," and 8 hours "travel[ing] to vendors/customers."[65]  In response to UNUM's request, Chief Scientist J.R. Huddle offered a slightly different description of Ratkovic's job - which he identified as that of "Sr. Engineer Multidiscipline."  During a 40 hour week, Huddle stated, Ratkovic spent 20 hours "develop[ing] concepts . . . [a] creative task which requires the development of

---

[60]*Id*. at 7.

[61]Pl.'s Reply at 6.

[62]AR at 625.

[63]AR at 632.

[64]AR at 279.

[65]AR at 15.

Navigation System concepts;" 12 hours "writ[ing] proposals;" and 8 hours making "presentations."[66] Summarizing these tasks, Huddle stated: "The job tasks can be performed primarily at a desk. However presentations that must be made require traveling to customer premises and standing to deliver the presentation."[67]

55. Based on these job descriptions, the record clearly shows that travel constituted an integral part of Ratkovic's occupation as performed at his employer. This conclusion is further bolstered by the fact that Ratkovic's injury occurred while he was traveling on company business in Taiwan. There is no contrary evidence in the record.

56. As noted, all of the medical professionals who reviewed Ratkovic's record agreed on his restrictions and limitations. UNUM concluded that he was restricted to "sedentary capacity" work.[68] The Department of Labor ("DOL") publishes a Dictionary of Occupational Titles ("DOT"), which defines the varying levels of exertion required by jobs as they are generally performed in the national economy. The DOT defines "Sedentary Work" as "[e]xerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."[69] The DOT defines "Light Work" as "[e]xerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a

---

[66]AR at 77.

[67]AR at 77.

[68]See AR at 624 (noting that Ratkovic was restricted to "sedentary capacity"); see also Def.'s Trial Brief at 11-12 (repeatedly noting the parties' general agreement that Ratkovic could perform sedentary work).

[69]DICTIONARY OF OCCUPATIONAL TITLES (4th Ed., Rev. 1991) ("DOL"), Appx. C, § IV(c); see also 20 CFR § 404.1567(a) (adopting the DOT's definition).

negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects.  Physical demand requirements are in excess of those for Sedentary Work.  Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible."[70]

57.     It is not clear whether the travel required by Ratkovic's position as it was performed at his employer took his work out of the "sedentary" category and placed him in the "light work" category.  Stated differently, it is not clear whether the travel required by Ratkovic's position required "walking or standing to a significant degree" or "walking and standing for a brief time."[71]

58.     Whether Ratkovic's position is properly understood as "sedentary" or as "light" work, the question is whether UNUM properly considered all of the duties of the position in deciding that Ratkovic was not disabled.  Byard, UNUM's vocational analyst, stated that he had reviewed "the claimant's Job Description for his position as an Aerospace Engineer."[72]

---

[70]*Id.*; see also 20 CFR § 404.1567(b).

[71]While the court declines to rule on this issue, other courts addressing the question squarely have suggested that positions that require "significant travel" are not properly understood as "sedentary."  See *Osborne v. Hartford Life and Acc. Ins. Co.*, 465 F.3d 296, 301-02 (6th Cir. 2006) ("there is a discrepancy between the significant travel required by Osborne's actual position and the Dictionary's classification of his occupation as sedentary"); *Wirries v. Reliance Standards Ins. Co.*, No. 01-565-E-MHW, 2005 WL 2138682, *6 (D. Idaho Sept. 1, 2005) (referring to travel as a duty that is "non-sedentary in nature").

[72]AR at 611.  The basis for Byard's conclusion that Rakovic was an "Aerospace Engineer" is unclear.  NGC does not cite to information in the record supporting the conclusion, and the court has found no document which used that precise language to describe Ratkovic's job. Rakovic stated that he was a "research scientist."  (AR at 15.)  Northrop Grumman described his job as "Engineering & Sciences - Multi-discipline."  (AR at 36.)  Huddle stated that Ratkovic's job title was "Sr. Engineer Multidiscipline" and that the "nature of [the] business" was

Byard noted that the work of an Aerospace Engineer "may involve written research proposals, the completion of statistical modeling tasks, evaluating prototypes, writing research summaries, and presenting results, etc. . . . The work is primarily performed in a seated posture with the occasional opportunity for standing and/or walking interspersed throughout the day."[73] While Byard's description of Ratkovic's duties is generally in accord with the job descriptions provided by Ratkovic and Huddle, it fails entirely to address the issue of travel.

59.   In its letter denying Ratkovic's appeal, UNUM essentially adopted Byard's analysis. It identified Ratkovic's position as that of an Aerospace Engineer and described the necessary duties of the job in the same terms as Byard.[74] Specifically, UNUM stated that Ratkovic's occupation required "occasional lifting/exertion of force of up to 20 lbs" and that it was "primarily performed in a seated posture with the occasional opportunity for standing and/or walking interspersed throughout the work day."[75] As did Byard, UNUM made no reference to the fact that, according to Ratkovic, he spent 20% of his time (8 hours per week) traveling to give presentations. Nor did UNUM reference Huddle's representation that Ratkovic's position required him to spend 20% of his time giving presentations, a task Huddle later described as requiring travel.[76]

60.   Given this omission, the court concludes that UNUM failed to take the travel requirement

---

"Aerospace, Defense." (AR at 77.) While it is perhaps possible to deduce from these responses that Ratkovic was an Aerospace Engineer, the conclusion is neither obvious nor compelled. With the exception of travel, however, the tasks Byard describes largely match those cited by Ratkovic and Huddle. Consequently, the fact that Byard referred to Ratkovic as an "Aerospace Engineer" does not mandate a conclusion that he failed to examine the record.

[73]AR at 611-12.

[74]AR at 624.

[75]AR at 625.

[76]AR at 77 ("However presentations that must be made require traveling to customer premises and standing to deliver the presentation").

1   of Rakovic's position into account when determining whether or not he was disabled.

2   61.   UNUM's failure to consider the travel component of Ratkovic's job cannot be attributed

3         to a decision to consider the general job category of "Aerospace Engineer" rather than the

4         specific requirements of Ratkovic's job.[77]   Both Byard and UNUM concluded that

5         Ratikovic's "restrictions and limitations would not preclude [him] from performing his job

6         as it is specifically performed at his employer."[78] They reached the same conclusion with

7         respect to his ability to "perform[ ] the material and substantial duties of is occupation as

8         it is generally performed."[79]  If travel was not considered because UNUM was referencing

9         the duties of the job as generally performed in the labor market, it would have noted that

10        while travel was required at Northrop Grumman, it was not universally so.  The letter,

11        however, contains no such statement.   Nor does it state that the travel required by

12        Ratkovic's position was atypical of the occupation.  Indeed, even as described by UNUM,

13        the job of an Aerospace Engineer includes "presenting results." Unless videoconferencing

14        or other form of technology is employed, presenting results almost always necessitates

15        some amount of travel to reach the audience for the presentation.[80]   For all of these

16        reasons, the court concludes that UNUM's failure to consider travel cannot be attributed

17        to the level of generality at which UNUM considered Ratkovic's occupation.

18  62.   A plan administrator's decision is an abuse of discretion "where the administrator

19        'arbitrarily refuse[s] to credit a claimant's reliable evidence.'"  *Jordan*, 370 F.3d at 879

20        (quoting *Nord*, 538 U.S. at 834).   In this case, evidence in the administrative record

21        unequivocally indicated that Ratkovic's job required him to travel.  There is, in fact, no

22

23        _____

24        [77]For present purposes, the court accepts UNUM's characterization of Ratkovic as an
          "Aerospace Engineer."   As noted, this characterization is not directly supported by the record.

25        [78]AR at 625.

26        [79]*Id.*

27        [80]Huddle's description states "presentations that must be made require traveling to customer
28        premises and standing to deliver the presentation."  (AR at 77.)

contrary evidence.  In making its determination UNUM appears to have simply ignored this requirement.  When a plan administrator ignores undisputed evidence that might support an award of benefits, it abuses its discretion.  See *Jani v. Bell*, 209 Fed.Appx. 305, 314 (4th Cir. Dec. 13, 2006) (Unpub. Disp.) ("Because a fiduciary must present substantial evidence to justify a denial of benefits, it logically follows that a fiduciary appears to abuse its discretion when, in denying benefits, it ignores unanimous relevant evidence supporting the award of benefits"); *Walters v. Prudential Ins. Co. of America*, No. 06-CV-20-LRR, 2007 WL 4531311, *18 (N.D. Iowa Dec. 18, 2007) ("the Court finds that it was unreasonable for Prudential to both ignore and fail to articulate its reasons for disagreeing with the opinions of Dr. Romano, Dr. Bagheri, and Laughlin with regard to whether Walters was disabled during the elimination period"); *Nelson v. Holland*, No. 5:05-cv-00429, 2007 WL 1010201, *8 (S.D.W. Va. Mar. 30, 2007) (finding that the trustees of a benefit plan abused their discretion when they "simply decided to ignore the opinions reported in the letters of Drs. Kostenko and Carson, and failed to provide any substantive basis for doing so"); *Anderson v. Sotheby's, Inc.*, No. 04 Civ.8180 (SAS), 2006 WL 1722576, *15 (S.D.N.Y. June 22, 2006) ("In exercising its discretion, an administrator may weigh competing evidence but it may not 'cherry-pick' the evidence it prefers while ignoring significant evidence to the contrary"); see also *Brodish v. Federal Express Corp.*, 384 F.Supp.2d 827, 836 (D. Md. 2005) ("Although Kemper and FedEx cannot arbitrarily ignore the opinions of Brodish's treating physician, they reasonably may choose to credit the opinions of Drs. Blumberg and Ennis over Dr. Schon's").

63.   UNUM ignored undisputed evidence that Ratkovic's occupation required him to travel. Thus, when it analyzed whether or not Ratkovic's restrictions and limitations prevented him from performing his job, it failed to consider they precluded him from traveling.  This failure deprived Ratkovic of a "fair review" ofthe denial of his claim.  See *Firestone*, 489 U.S. at 113 (citing 29 U.S.C. § 1133(2)).

## 2.   UNUM Failed to Consider Ratkovic's SSDI Award

64.   UNUM's letter denying Ratkovic's appeal acknowledges the fact that Ratkovic had been

1    awarded SSDI benefits.   Indeed, the letter states that Ratkovic's overpayment was

2    recalculated to take into account the award information he provided.[81]

3    65.    As noted, every claimant under the Plan is required to apply for SSDI benefits after six

4    months.  A claimant's award is reduced by the amount (estimated or actual) of the award.[82]

5    66.    Although UNUM recalculated benefits to take into account the SSDI award Ratkovic

6    received, the record does not reflect that it considered the award in reviewing its denial of

7    his disability claim.  Significantly, the record does not show that UNUM advised either of

8    the reviewing medical professionals or the vocational analyst that Ratkovic had been

9    awarded SSDI benefits.  Ratkovic suggests that the failure to consider his SSDI award,

10    taken together with the fact that UNUM required him to apply for such an award and

11    benefitted from it, constitutes an independent basis for concluding that UNUM abused its

12    discretion.[83]

13    67.    In 2003, the Supreme Court held that whether or not a claimant was awarded SSDI benefits

14    was not directly relevant in assessing his entitlement to disability benefits under an ERISA

15    plan.  See *Nord*, 538 U.S. at 833 ("In determining entitlement to Social Security benefits,

16    the adjudicator measures the claimant's condition against a uniform set of federal criteria.

17    '[T]he validity of a claim to benefits under an ERISA plan,' on the other hand, 'is likely

18    to turn,' in large part, 'on the interpretation of terms in the plan at issue,'" quoting

19    *Firestone*, 489 U.S. at 115).  Following *Nord*, the Ninth Circuit has recognized the

20    "inappropriateness of importing Social Security rules into the ERISA context." *Jordan*,

21    370 F.3d at 869.

22    68.    Despite the Court's holding in *Nord*, some courts continue to consider the incongruity of

23    requiring a claimant to apply for SSDI benefits, on the one hand, and finding that he is not

24    disabled, on the other.  The Sixth Circuit, for example, has held that such a juxtaposition

---

[81]AR at 625.

[82]AR at 635.

[83]Pl.'s Trial Brief at 13.

"counsel[s] a certain s[k]epticism of a plan administrator's decision-making." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005).  In *Calvert*, a plan administrator denied Calvert's claim without considering the fact that he had been awarded SSDI benefits.  It did so despite the fact that it had required him to apply for such benefits and had "benefitted from the SSA determination by seeking and receiving reimbursement from Calvert for a portion of the payments it previously made to Calvert." *Id.* at 294.  The court stopped short of holding that an administrator in such a situation is estopped from disagreeing with the finding of disability inherent in the SSDI award.  *Id.* at 295 ("[T]he SSA's disability determination does not, standing alone, require the conclusion that Liberty's denial of benefits was arbitrary and capricious").  Rather, it stated, "[t]he SSA determination to award benefits to Calvert [was] . . . just one factor the Court should consider, in the context of the record as a whole, in determining whether Liberty's contrary decision was arbitrary and capricious." *Id.*  Stated differently, "[h]aving benefitted financially from the government's determination that [the claimant] was totally disabled, [the administrator] obviously should have given appropriate weight to that determination." *Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006); see *Leffew v. Ford Motor Co.*, 2007 WL 4443520, *7 (6th Cir. Dec. 14, 2007) (Unpub. Disp.) ("[W]hen a plan administrator requires a claimant to pursue social security disability to reduce the amount of benefits due under the plan, the SSA's determination of disability should not be ignored in determining disability under the plan").

69.   Both *Glenn* and *Calvert* cite a pre-*Nord* Seventh Circuit decision by Judge Posner, which held that "a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, 'casts additional doubt on the adequacy of their evaluation of . . . [a] claim, *even if it does not provide an independent basis for rejecting that evaluation*.'" *Calvert*, 409 F.3d at 294-95 (quoting *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998)).  While these decisions are not binding for a variety of reasons, the logic underlying them is instructive.

70.   While the Ninth Circuit has not addressed the question, a court within the circuit has

recognized that, where an administrator requires that the claimant apply for, and benefits from an SSDI award, its "denial of benefits under such circumstances may be deemed 'inconsistent,'[ ], and may 'cast additional doubt on the adequacy of [the plan's] evaluation of [the plaintiff's] claim.'" *Moskowite v. Everen Capital Corp.*, No. C 03 4666 MMC(MED), 2005 WL 1910941, *4 n. 5 (N.D. Cal. Aug. 10, 2005). The court agrees. The fact that UNUM did not consider Ratkovic's SSDI award is not alone sufficient to find that UNUM abused its discretion because, as the Ninth Circuit noted in *Jordan*, the *Nord* Court emphasized the differing standards of disability used in the Social Security and ERISA plan contexts. Here, however, the court has already determined that UNUM's review of Ratkovic's claim was inadequate. The fact that UNUM required Ratkovic to apply for SSDI benefits, and calculated a substantial overpayment (which it seeks to collect on NGC's behalf) when benefits were awarded, of NGC) "casts additional doubt" on its decision to deny Ratkovic benefits under the ERISA plan, and reaffirms and supports the court's conclusion that it abused its discretion in this case.

### 3.     UNUM Did Not Misapply The Language of the Plan

71.   A claimant under the Plan is disabled when he is prevented from performing "any and every duty" of his regular occupation.[84] In UNUM's letter denying Ratkovic's benefits, it concluded that his disability did not preclude him from "performing the material and substantial duties of his occupation as it is generally performed" or "[from] performing his job as it specifically performed at his employer."[85]

72.   Ratkovic argues that UNUM's reference to "material and substantial duties" is inconsistent with the language of the Plan, which requires reference to "any and every" duty. While Ratkovic is correct that the two standards differ, he fails to recognize that UNUM also concluded that his restrictions and limitations did not preclude him from performing the specific duties of his job as it was performed at NGC. While this formulation too is not

---

[84]AR at 632.

[85]AR at 625.

couched in the "any and every" duty language found in the plan, there is no substantive difference between them.  UNUM's assertion that Ratkovic could perform the "specific duties" of his job at NGC necessarily implies that he could perform "any and every" one of them.

73.   For this reason, the court finds that UNUM did not apply the wrong definition of "disabled" under the Plan.

### 4.    Whether the Court Should Remand the Claim for Further Review

74.   The court has found that UNUM abused its discretion by failing to consider the fact that travel constituted an integral part of Ratkovic's occupation.  Despite this finding, the court is not in a position to determine whether, had UNUM considered the undisputed evidence that travel was integral to his job, it would have concluded that Ratkovic was disabled under the plan.  While travel appears to be a non-sedentary activity, the court cannot determine how UNUM interpreted the DOT definition of "sedentary," and applied it to Ratkovic's specific limitations as stated by the medical professionals.  Because the record does not provide sufficient information to resolve this question, the court cannot determine how UNUM would have exercised its discretion under the plan.

75.   ERISA "affords the courts a range of remedial powers . . . and returning the case to a plan administrator for further consideration is often appropriate."  *King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 1005 (8th Cir. 2005) (collecting cases).  "The remedy when an ERISA administrator fails to make adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation."  *Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276, 1288 (10th Cir. 2002); see *Finley v. Hartford Life & Acc. Ins. Co.*, No. C 06-6247 CW, 2007 4374417, *10 (N.D. Cal. Dec. 14, 2007) (after finding that the administrator had not adequately considered all evidence in the record before denying plaintiff's claims, the court remanded for further proceedings, citing *Caldwell*).  Similarly, where the administrator fails to consider relevant evidence, it is appropriate for the court to remand so that the administrator can consider that evidence.  See *Walters*, 2007 WL 4531311 at *18 (finding,

27

in a case where the administrator failed to consider the opinions of two doctors that it was "appropriate to remand this matter to Prudential for further consideration and discussion" of the opinions).

76.   Because UNUM failed adequately to consider evidence that Ratkovic's job required him to travel, and because it is not clear how UNUM would have resolved Ratkovic's appeal had it taken this fact into account, the court remands the claim to UNUM for further review.  On remand, UNUM must consider evidence in the record indicating that travel was an integral part of Ratkovic's job duties.  It must also consider the effect, if any, on its disability determination of the fact that Ratkovic has been awarded SSDI benefits.

77.   Because the court remands this action, it declines to award benefits, as Ratkovic requests. For the same reason, the court declines to address UNUM's request for reimbursement of the overpayment it has calculated under the Plan.

### III. CONCLUSION

Based upon the court's findings of fact and conclusions of law, the court concludes that UNUM (and by extension NGC) abused its discretion when it failed to consider undisputed evidence in the record that travel was an integral component of Ratkovic's occupation.  The court thus overturns UNUM's denial of benefits and remands the matter to the administrator for additional review for further review.

DATED: February 20, 2009

_Margaret M. Morrow_
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

28